**No. 16-5246**

---

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL
IMPLEMENT WORKERS OF AMERICA, LOCAL 3047; INTERNATIONAL
UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL
IMPLEMENT WORKERS OF AMERICA, AFL-CIO, CLC; INTERNATIONAL
CHEMICAL WORKERS UNION COUNCIL FOR THE UNITED FOOD AND
COMMERCIAL WORKERS; UNITED FOOD AND COMMERCIAL
WORKERS, LOCAL 970C; UNITED FOOD & COMMERCIAL WORKERS
LOCAL UNION NO. 227; GENERAL DRIVERS, WAREHOUSEMEN &
HELPERS, LOCAL UNION NO. 89; INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS LOCAL 369; IUE-CWA, THE INDUSTRIAL
DIVISION OF THE COMMUNICATIONS WORKERS OF AMERICA, AFL-
CIO, CLC; and IUE-CWA, THE INDUSTRIAL DIVISION OF THE
COMMUNICATIONS WORKERS OF AMERICA, LOCAL 83766,

*Plaintiffs-Appellees,*

*v.*

HARDIN COUNTY, KENTUCKY; HARRY L. BERRY, JUDGE/EXECUTIVE;
JOHN WARD, SHERIFF; and JENNIFER B. OLDHAM, COUNTY ATTORNEY

*Defendants-Appellants.*

On Appeal from the United States District Court
For The Western District of Kentucky, Louisville Division
Civil Action No. 3:15-cv-00066-DJH

---

## BRIEF OF DEFENDANTS-APPELLANTS HARDIN COUNTY,
## KENTUCKY; HARRY L. BERRY, JUDGE/EXECUTIVE; JOHN WARD,
## SHERIFF; and JENNIFER B. OLDHAM, COUNTY ATTORNEY

---

Counsel for Defendants-Appellants Listed on Following Page

John T. Lovett
Kyle D. Johnson
FROST BROWN TODD LLC
400 West Market Street, 32nd Floor
Louisville, KY  40202-3363
Telephone: (502) 589-5400
Facsimile: (502) 581-1087

*Counsel for Appellants Hardin County,
Kentucky; Harry L. Berry, Judge/Executive;
John Ward, Sheriff; and Jennifer B. Oldham,
County Attorney*

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Pursuant to 6th Cir. R. 26.1, Defendants-Appellants Hardin County, Kentucky; Harry L. Berry, Judge/Executive; John Ward, Sheriff; and Jennifer B. Oldham, County Attorney, make the following disclosures:

1.     Is said party a subsidiary or affiliate of a publicly owned corporation?  **NO – none of the Defendants-Appellants are affiliates of a publicly owned corporation.**

2.     Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  **NO**


/s/ John T. Lovett                                     May 13, 2016
*Counsel for Defendants-Appellants,*
*Hardin County, Kentucky;*
*Harry L. Berry, Judge/Executive;*
*John Ward, Sheriff; and*
*Jennifer B. Oldham, County Attorney*

# TABLE OF CONTENTS

**STATEMENT IN SUPPORT OF ORAL ARGUMENT** ................................. viii

**S**TATEMENT OF JURISDICTION................................................... viii

**STATEMENT OF ISSUES** ...........................................................1

**STATEMENT OF THE CASE**........................................................1

    A.    The National Labor Relations Act Neither Protects nor Prohibits Compulsory Unionism..........................................................4

    B.    Hardin County, Kentucky has adopted an ordinance prohibiting compulsory unionism……………………………………………... 9

    C.    Hardin County's important public objectives for Ordinance 300. .................................................................................11

    D.    The District Court erroneously concludes that Ordinance 300 is preempted by the National Labor Relations Act.................................14

**SUMMARY OF ARGUMENT** ..........................................................16

**ARGUMENT** ...........................................................................19

I.    Standard of Review...........................................................19

II.    The NLRA does not preempt state or local right-to-work laws....................20

    A.    The NLRA contains no express preemption of right-to-work laws...................................................................................21

    B.    The NLRA creates no conflict preemption with right-to-work laws...................................................................................22

    C.    "Field Preemption" does not apply to Ordinance 300. ......................22

        1.    The NLRA does not preempt the field of right-to-work laws. ...................................................................................23

        2.    Section 14(b) is not a "narrow exception" to "field" preemption of right-to-work laws, but an affirmation that Section 8(a)(3) was never intended to be preemptive. .............30

III.  Section 14(b) of the NLRA expressly exempts Ordinance 300 from preemption. ...............................................................................34

    A.  States can delegate their lawmaking authority to adopt right-to-work laws to their political subdivisions...............................35

    B.  Ordinance 300 falls squarely within the definition of "State or Territorial law" as used in Section 14(b). ...........................39

        1.  The principle that the term "State" includes political subdivisions is rooted in fundamental principles of federalism, and applies outside the FIFRA and ICA. ...............40

        2.  Section 14(b)'s use of the phrase "in any State" does not constitute "clear and manifest" intent to override local ordinances. ...............................................................................44

        3.  Parallel language used in the Railway Labor Act confirms that the term "State" includes a state's political subdivisions...............................................................................47

    C.  The District Court erroneously relied upon an outdated decision that is not controlling and lacks any persuasive value. .......................49

IV.  "HIRING HALL" AND "DUES CHECKOFF" PROVISIONS ARE NOT PREEMPTED.......................................................................51

    A.  Dues Checkoff Provision is not preempted.........................................53

    B.  Hiring Hall provision is not preempted...............................................55

**CONCLUSION**..................................................................................................57

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(c)**

**CERTIFICATE OF SERVICE**

**ADDENDUM - DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board,*
     336 U.S. 301 (1949) ....................................................................................*Passim*

*Auto Workers v. Russell,*
     356 U.S. 634 (1958) ................................................................................. 8

*Breard v. City of Alexandria, La.,*
     341 U.S. 622 (1951) ................................................................................ 11

*Breininger v. Sheet Metal Workers,*
     493 U.S. 69 (1984) ................................................................................. 55

*City of Columbus v. Ours Garage & Wrecker Service, Inc.,*
     536 U.S. 424 (2002) ....................................................................................*Passim*

*Communications Workers of Am. v. Beck,*
     487 U.S. 735 (1988) .................................................................... 2, 5, 6, 33, 47, 48

*Construction Workers v. Laburnum Const. Corp.,*
     347 U.S. 656 (1954) ................................................................................. 8

*English v. General Electric Company,*
     496 U.S. 72 (1990) ............................................................................. 20, 21

*Eric M. Berman, P.C. v. City of New York,*
     895 F. Supp. 2d 453 (E.D.N.Y. 2012) ................................................................ 43

*Erie Brush & Mfg. Corp. v. N.L.R.B.,*
     700 F.3d 17 (D.C. Cir. 2012) ....................................................................... 51

*Farmer v. Carpenters Local 25,*
     430 U.S. 290 (1977) ............................................................................. 8, 28

*Fireman's Fund Ins. Co. v. City of Lodi, California,*
     302 F.3d 928 (9th Cir. 2002) ................................................................ 42, 45, 46

iv

*Gade v. National Solid Wastes Management Ass'n*,
   505 U.S. 88 (1992) .................................................................. 21, 54

*Kentucky State AFL-CIO v. Puckett*,
   391 S.W.2d 360 (Ky. 1965) .................................................. 49, 50, 51

*Laborers Int'l Union Local 107 v. Kunco, Inc.*,
   472 F.2d 456 (8th Cir. 1973) ...................................................... 56

*Lexington-Fayette Urban County Gov't. v. Smolcic*,
   142 S.W.3d 128 (Ky. 2004) .................................................. 11, 20, 34

*Linn v. Plant Guard Workers Local 114*,
   383 U.S. 53 (1966) ...................................................................... 8

*Local 514, Transport Workers v. Keating*,
   212 F. Supp. 2d 1319 (E.D. Okla. 2002) ................................... 55, 56

*Lord v. Local Union No. 2088, Int'l Brotherhood of Elec. Workers, AFL-CIO*,
   646 F.2d 1057 (5th Cir. 1981) .................................................... 50

*Mariland v. Louisiana*,
   451 U.S. 725 (1981) ................................................................ 20, 52

*Metro. Life Ins. Co. v. Taylor*,
   481 U.S. 58 (1987) ...................................................................... 48

*Millsaps v. Thompson*,
   259 F.3d 535 (6th Cir. 2001) ........................................................ 19

*Nixon v. Missouri Mun. League*,
   541 U.S. 125 (2004) .............................................................. 16, 41, 42

*NLRB v. Babcock & Wilcox Co.*,
   351 U.S. 105 (1956) ...................................................................... 8

*NLRB v. General Motors Corp.*,
   373 U.S. 734 (1963) .............................................................. 2, 19, 53

*NLRB v. Houston Chapter Ass'd Gen'l Contractors,*
349 F.2d 449 (5th Cir. 1965) .................................................................. 56

*NLRB v. Pueblo of San Juan,*
276 F.3d 1186 (10th Cir. 2002) ................................................ 30, 33, 50

*NLRB v. Tom Joyce Floors, Inc.,*
353 F.2d 768 (9th Cir. 1965) .................................................................. 56

*Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO v. Mobil Oil Corp.,*
426 U.S. 407 (1976)............................................................................ 31, 32

*Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn,*
375 U.S. 96 (1963).............................................................................*Passim*

*Sailors v. Board of Ed. of Kent Cty.,*
387 U.S. 105 (1967)............................................................ 11, 16, 41, 46

*San Diego Bldg. Trades Council v. Garmon,*
359 U.S. 236 (1959)........................................................ 26, 27, 28, 29, 55

*SeaPak v. Indus., Technical & Prof'l Emp., Div. of Nat'l Mar. Union, AFL-CIO,*
300 F. Supp. 1197 (S.D. Ga. 1969) ...................................................... 53

*Sears, Roebuck & Company,*
436 U.S. 180 (1978)................................................................................. 8

*Seminole Tribe of Fla. v. Florida,*
517 U.S. 44 (1996).................................................................................. 32

*Synagro-WWT, Inc. v. Rush Twp., Penn,*
204 F. Supp. 2d 827 (M.D. Penn. 2002)............................................... 42

*Vill. of Schaumberg v. Citizens for a Better Env.,*
*444 U.S. 620 (1980)*............................................................................ *11*

*Wisconsin Public Intervenor v. Mortier,*
501 U.S. 597 (1991)...........................................................................*Passim*

## Statutes

28 U.S.C. § 1291 ................................................................ 2
28 U.S.C. § 1331 ................................................................ 2
29 U.S.C. §§ 151-169 .......................................................... 4
29 U.S.C. § 152(2) ........................................................ 39, 46
29 U.S.C. § 158(a) ...................................................... 4, 5, 23
29 U.S.C. § 158(a)(3)................... 1-3, 15, 18, 21-25, 30, 33, 39, 47, 53
29 U.S.C. § 164(b) ............................................. 21, 27, 38, 45
29 U.S.C. § 186(c)(4) ........................................................ 54
42 U.S.C. § 9601(21) ...................................................... 45-46
42 U.S.C. § 9614(a) .......................................................... 45
45 U.S.C. § 152 .......................................................... 33, 47
47 U.S.C. § 253 .............................................................. 42
49 U.S.C. § 14501(c)(1) ...................................................... 37
93 Cong. Rec. 6520, 6679 (June 6, 1947)...................................... 27
Ind. Code Ann. §§ 22-6-6-1 to -13 ........................................... 12
KRS 67.083 .................................................................. 11
KRS 67.083 (m) and (x)........................................................ 9
LMRA, 1947, ch. 120, 61 Stat. 136 (1947) ...............................5-6, 54
Ordinance 300, Series 2014 ....................1, 9-11, 13, 51, 54
Tenn. Code Ann. §§ 50-1-201 to -208.......................................... 12
U.S. Const. art. VI cls. 2 .................................................. 19
§ 14501(c)(2)................................................................ 37
§ 14501(c)(2)(C) ............................................................ 38

## Rules

Fed. R. App. P. 32(a)(7)(C) ................................................. 57

## Other Authorities

H.R. Rep. No. 510, at 60.................................................. 7, 31

*The Effect of State Policies on the Location of Manufacturing; Evidence
    From State Borders,* 106, No. 4 Journal of Political Economy (1998)
    (Thomas J. Homes) ...................................................... 12

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellants respectfully request oral argument. The primary questions presented in this appeal — whether the National Labor Relations Act preempts the field of compulsory unionism and whether states may delegate their authority to regulate compulsory unionism to their political subdivisions — are questions of first impression in this Circuit, which have enormous significance well beyond the context of this particular controversy. Appellants believe that oral argument will assist the Court in understanding the issues and allow the attorneys to address any matters that the Court deems relevant.

## STATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction over this action under 28 U.S.C. § 1331, insofar as the Complaint and Amended Complaint alleged claims arising under the Supremacy Clause of the United States Constitution. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291, as this is an appeal from a final order and judgment that disposed of all parties' claims. The district court entered its final judgment on February 3, 2016, and Appellants timely filed their Notice of Appeal with the district court clerk on February 29, 2016.

**STATEMENT OF ISSUES**

I.     By declaring it did not intend to preempt states' laws regulating compulsory unionism in Section 14(b) of the NLRA, 29 U.S.C. § 164(b), did Congress nonetheless intend to preempt the power of states to delegate such lawmaking power to their political subdivisions?

II.    Did Congress, when it enacted the first proviso of Section 8(a)(3) of the NLRA, 29 U.S.C. § 158(a)(3), intend to preempt the field of compulsory-unionism laws?

III.   Does the authority of states and their political subdivisions to regulate compulsory unionism include the authority to regulate wage-deduction authorizations for union dues and the authority to prohibit mandatory hiring-hall referrals as part of this regulation?

**STATEMENT OF THE CASE**

On January 13, 2015, Appellant, Hardin County, Kentucky, adopted Ordinance 300, Series 2014 ("Ordinance 300").  Ordinance 300 prohibits collective bargaining agreements ("union contracts"), within Hardin County, from requiring that employees join or pay money to a labor union in order to keep their jobs. The Ordinance also includes attendant measures intended to insure the benefits to workers of this protection. (Ordinance 300, RE 5-1, Page ID # 94-98.)

On January 15, 2015, nine international and local unions sued Hardin County and three of its elected officials in the United States District Court for the Western District of Kentucky. (Complaint, RE 1, Page ID # 1-47.) The Complaint charged that the National Labor Relations Act (hereinafter referred to as "NLRA" or the "Act") preempts Ordinance 300.  Since the litigation presented only a single legal issue, both parties moved for Summary Judgement. (Summary Judgment

1

Motions:   Plaintiffs' Motion, RE 7 & 8, Page ID # 100-153; Defendants' Response, RE 14, Page ID # 193-208; Defendants' Motion, RE 16, page ID # 220-274; Plaintiffs' Jt. Response/Reply, RE 31, ID # 1138-1157; Defendants' Reply, RE 34, Page ID # 1163-1173.) On February 3, 2016, the Honorable David Hale awarded summary judgment to the union Plaintiffs. (Mem. Op. & Order, RE 43, page ID # 1277-1290; Judgment, RE 44, Page ID # 1291.) This appeal followed. (Notice of Appeal, RE 45, Page ID # 1292-1293.)

Congress and the courts frequently refer to union contracts that force employees join or pay money to a union, or forfeit their employment, as "compulsory unionism."[1] Union contract language imposing compulsory unionism is sometimes referred to as "union-security" agreements, "closed shop," "union shop," or "agency shop" agreements, depending on the approach taken to force all employees to support the union.[2] Legislation, like Ordinance 300, is often termed

---

[1] *See, e.g., Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 102 (1963).

[2] Under "closed shop" language, the employer agrees that it will only hire workers that are, at the time of hire, members of union. "Union shop" language permits the employer to hire anyone, but the newly hired employee must become a union member shortly after hire, usually 30 to 60 days, to keep his/her job. *See, Communications Workers of Am. v. Beck*, 487 U.S. 735, 747-48 (1988). "Agency shop" is the same as a "union shop" except that employees must pay union dues and a union initiation fee but need not actually become union members. *See, N.L.R.B. v. Gen. Motors Corp.*, 373 U.S. 734, 736 (1963).

2

"right-to-work" legislation, since it protects employees from losing their jobs because they choose not to support a union.[3]

Right-to-work laws grow out of a fundamental tension between individual freedom and unions' desire for more "collective" power. Federal labor law guarantees individual, employee freedom from discrimination based upon whether the employee supports or opposes a union.[4] Compulsory unionism contradicts this freedom from discrimination. It compels employee support for a union. An employer agrees with a union to discharge any employee who does not support the union.

Unions, however, contend that their cause justifies this sacrifice of individual freedom. They argue that compelling employee support for a union is needed to strengthen union power beyond what the union can achieve through voluntary employee support. This added union power, unions assert, improves wages and working conditions.

Opinions on the merits, and even ethics, of compulsory unionism vary widely and fiercely among individuals, communities, and regions of the county. In light of this, the NLRA has never imposed a uniform national policy on the subject

---

[3] *See, e.g., Retail Clerks Intern. Ass'n., Local 1625,* 375 U.S. at 98.

[4] National Labor Relations Act § 8(3), ch. 372, 49 Stat. 452 (1935) (codified as amended as 29 U.S.C. § 158(a)(3) (2016).

of compulsory unionism. The Act mandates uniform, federal control over many other aspects of labor-management relations – **but never** compulsory unionism.

From the Act's depression-era beginnings to the present, Congress has been careful to strike a balance. The NLRA does not forbid compulsory unionism, but neither does the NLRA promote compulsory unionism. Consistent with this longstanding position of balance and neutrality, Congress expressly declared in the NLRA that the Act does <u>not</u> preempt state laws prohibiting compulsory unionism. The question in this case is whether, in declaring the NLRA did not preempt state right-to-work laws, Congress nonetheless intended to preempt the States' ability to delegate authority to their political subdivisions to enact such laws. The language and history of the NLRA make clear that it did not.

### A.    The National Labor Relations Act Neither Protects nor Prohibits Compulsory Unionism.

Congress passed the NLRA, CH. 372, 49 Stat. 449 (1935) (codified as amended at 29 U.S.C. §§ 151-169) in 1935. The NLRA represented the first, successful, national scheme to protect and regulate the relationship between employers, workers, and labor unions. The original NLRA legislation is frequently referred to as the Wagner Act.  The Wagner Act conspicuously avoided taking any position on compulsory unionism.

Section 8(3) of the Wagner Act forbids employers to "discriminate in regard to hire or tenure of employment . . . to ***encourage or discourage*** membership in

4

any labor organization." NLRA § 8(3), 49 Stat. 452 (emphasis added); *see also* 29 U.S.C. § 158(a) (2016) (same). To avoid the controversial issue of compulsory unionism, however, Congress added a proviso to Section 8(3). In plain words, the proviso announced that federal labor law would not prohibit (or require) compulsory unionism, but the proviso, as well as the rest of the Act, contains nothing to prevent state or local governments from passing right-to-work laws.

The relevant portion of Section 8(3) read in 1935, and still reads today:

> "Nothing in this Act**, . . .** or any other statute *of the United States,* shall preclude an employer from making an agreement with a labor organization to require as a condition of employment membership therein. . . ."

*Id.* (parentheticals omitted; emphasis added). The Section 8(3) proviso, now numbered Section 8(a)(3), kept the Act and other *federal* law from forbidding compulsory unionize. It offered no protection, however, against state or local laws forbidding employers to discriminate against workers who would not join a union.

In 1947, Congress passed the Labor Management Relations Act amending the NLRA. Labor Management Relations Act, 1947, ch. 120, 61 Stat. 136 (1947) ("LMRA"). The LMRA is frequently referred to as the Taft-Hartley Act, or the "Taft-Hartley Amendments." The Taft-Hartley Amendments left unchanged the Wagner Act's Section 8(3) language. The NLRA continues to state merely that "(n)othing in this Act, . . . or any other statute of the United States, shall preclude"

5

compulsory unionism.  NLRA § 8(a)(3); 29 U.S.C. § 158(a) (2016) (same). State and local law remains free to preclude compulsory unionism.

In passing the LMRA, Congress did act to forbid one form of compulsory unionism, the "closed shop."  A "close shop" is an agreement in which the employer agrees that it will only hire workers that are, at the time of hire, already members of the union. *Communications Workers of Am. v. Beck,* 487 U.S. 735, 747 (1988). By 1947, "Congress determined that the closed shop and the abuses associated with it created too great a barrier to free employment to be longer tolerated." *Beck*, 487 U.S. at 748 (quotation omitted).

The Taft-Hartley Amendments did not prohibit compulsory unionism, *per se*, but required a thirty-day waiting period before an employee could be forced to join the union. The amendments also re-designating Section 8(3) as Section 8(a)(3) to accommodate a new Section 8(b) making unlawful several union "unfair labor practices." *See* Labor Management Relations Act, 1947, ch. 120, 61 Stat. 136, 140-41 (1947).

Congress wanted to make sure, however, that its decision to prohibit one form of compulsory unionism, the "close shop," was not misinterpreted as implying federal protection of other forms of compulsory unionism. In passing the Taft-Hartley Amendments, Congress did not intend to imply that governments,

other than "the United States," were now preempted from passing right-to-work laws.

Twelve states already had right-to-work laws at the time Congress passed the Taft-Hartley Act. So, congressional concerns naturally focused upon the right of States[5] to enact such laws. *See, Retail Clerks Intern. Ass'n., Local 1625, AFL-CIO v. Schermerhorn,* 375 U.S. 96, 100 (1963). The legislative history demonstrates Congress was anxious to protect federal neutrality on right-to-work:

> It was never the intention of the National Labor Relations Act to preempt the field in this regard so as to deprive the States of their powers to prevent compulsory unionism. Neither the so-called 'closed shop' proviso in section 8(3) of the existing act nor the union shop and maintenance of membership proviso in section 8(a)(3) of the conference agreement could be said to authorize arrangements of this sort in States where such arrangements were contrary to the State policy.

*Id.* at 102 (quoting H.R. Rep. No. 510, at 60 (1st Sess. 1947)) (ellipsis omitted).[6]

---

[5] As discussed fully below, local laws are included within the scope of state law for purposes of determining whether local laws are free from federal preemption, absent Congress expressing a "clear and manifest purpose to preempt local authority." *Wisconsin Public Intervenor v. Mortier,* 501 U.S. 597, 607 (1991); *See also, City of Columbus v. Ours Garage & Wrecker Service, Inc.,* 536 U.S. 424, 433 (2002).

[6] In 1949, the Supreme Court in *Algoma* would accurately read Congress' intent that Section 8(3) of the NLRA have no preemptive impact whatsoever. *See Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Bd.,* 336 U.S. 301, 308-10 (1949). But two years earlier when Congress passed the LMRA, it did not know the Supreme Court would correctly interpret Section 8(3). *See also, Schermerhorn*, 375 U.S. at 101 n.8.

Accordingly, Congress took action to prevent claims of federal preemption of right-to-work laws. The LMRA added a new provision to the NLRA, Section 14(b), which states:

> Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

NLRA § 14(b) (codified at 29 U.S.C. § 164(b)). Congress' purpose for enacting Section 14(b) was to "mak[e] clear and unambiguous the purpose of Congress not to preempt the field" of right-to-work legislation. *Schermerhorn*, 375 U.S. at 101. The NLRA has remained unchanged since the Taft-Hartley Amendments of 1947. Over its over eighty-year history, the NLRA has **never** preempted any right-to-work law.

During its over eighty years of interpreting the NLRA, the Supreme Court has found that the NLRA preempts many (although not all[7]) **other** aspects of labor-

---

[7] The Supreme Court has also held that the NLRA does not preempt other labor relations matters of particular local concern. Examples include: (a) the NLRA does not preempt enforcement of state law against union threats of violence against a non-union employer, *Construction Workers v. Laburnum Const. Corp.,* 347 U.S. 656, 663-65 (1954); (b) the NLRA does not preempt enforcement of trespass laws against union picketing on employers' private property, *Sears, Roebuck & Company v. San Diego Co. Dist. Council of Carpenters,* 436 U.S. 180, 198-207 (1978), *but see, NLRB v. Babcock & Wilcox Co.,* 351 U.S. 105, 112 (1956)(under rare circumstances the NLRA can protect picketing on employer's private property); (c) the NLRA does not preempt state courts from awarding damages for tortious conduct or mass picketing, *Laburnum Construction Corp.,* 347 U.S. at

management relations, ***but never*** compulsory unionism. As to right-to-work laws, the Court has twice ruled that Congress, has made "clear and unambiguous the purpose of Congress not to preempt the field." *Schermerhorn*, 375 U.S. at 101; *Algoma*, 336 U.S. at 308-10. The Supreme Court has never reversed these clear declarations that the NLRA does not preempt right-to-work laws.

### B. Hardin County, Kentucky has adopted an ordinance prohibiting compulsory unionism.

Kentucky has not outlawed compulsory unionism on a state-wide basis. Kentucky has, however, delegated to its county governments express authority for, among other things, the "regulation of commerce" and the "promotion of economic development" within each county's borders. KRS 67.083 (m) and (x). Pursuant to this authority, Hardin County adopted Ordinance 300 prohibiting compulsory unionism, after determining that it would benefit both commerce and economic development within Hardin County. (County of Hardin Ordinance No. 300, Series

---

663-64; *Auto Workers v. Russell,* 356 U.S. 634, 643 (1958)("a clearer declaration of congressional policy" required before the Court would find preemption); (d) liable actions arising in labor disputes are not preempt if the defamatory statements are made with malice and actual damages resulted, *Linn v. Plant Guard Workers Local 114,* 383 U.S. 53, 61 (1966); (e) the NLRA does not preempt regulation of intentional infliction of emotional distress caused by union harassment, *Farmer v. Carpenters Local 25*, 430 U.S. 292, 302-06 (1977) ("inflexible application of the [*Gorman* preemption] doctrine is to be avoided.)

2014 [hereinafter "Ordinance 300"], RE 5-1, Page ID # 95-98.)  A total of twelve Kentucky counties have adopted right-to-work ordinances.[9]

Ordinance 300 implements right-to-work within Hardin County by prohibiting employers from discriminating against employees based upon whether the employee does or does not support a union.  Ordinance 300 also makes it unlawful for an employer to impose as a condition of employment a requirement that individuals be referred to the company through a labor organization.[10]  (*Id.*) Finally, the Ordinance frees employees to revoke wage deduction agreements for the payment of union dues when they so choose."[11]  (*Id.* § 5, Page ID # 96.)  The Ordinance contains severability language. If any portion of the Ordinance is determined to be invalid, the remaining portions remain valid and enforceable.  (*Id.* § 13, Page ID # 97-98.) The primary provisions of Ordinance 300 are found at Section 4, titled "Freedom of Choice Guaranteed, Discrimination Prohibited."  (*Id.* § 4, Page ID # 96.)  This provision states:

---

[9] Eight of these counties share a border with either Tennessee or Indiana, states with right-to-work laws.  These counties are Boone, Cumberland, Fulton, Logan, Monroe, Simpson, Todd, and Whitley Counties. Two of these counties are located on I-65 between Indiana and Tennessee.  These counties are Hardin County and Warren County. The remaining two counties are Butler and Rockcastle Counties.

[10] This type of referral system is typically called a "hiring hall" arrangement.

[11] Wage deduction agreements related to the payment of union dues are typically called "dues-checkoff" authorizations.

No person covered by the National Labor Relations Act shall be required as a condition of employment or continuation of employment:

> (A) to resign or refrain from voluntary membership in, voluntary affiliation with, or voluntary financial support of a labor organization;

> (B) to become or remain a member of a labor organization;

> (C) to pay any dues, fees, assessment, or other charges of any kind or amount to a labor organization;

> (D) to pay to any charity or other third party, in lieu of such payments, any amount equivalent to or a pro-rata portion of dues, fees, assessments, or other charges regularly required of members of a labor organization; or

> (E) to be recommended, approved, referred, or cleared by or through a labor organization.

(*Id.*)

On January 13, 2015, the Hardin County Fiscal Court adopted Ordinance 300 by a vote of eight Magistrates to one.  (*Id.*, Page ID # 98.)

### C.    Hardin County's important public objectives for Ordinance 300.

Hardin County is a political subdivision of the Commonwealth of Kentucky. *Lexington-Fayette Urban County Gov't. v. Smolcic,* 142 S.W.3d 128, 133 (Ky. 2004) ("Counties are unincorporated political subdivisions of the State"). As such, Hardin County is "regarded as (a) subordinate governmental instrumentality created by the State to assist in the carrying out of State governmental functions." *Sailors v. Board of Ed. of Kent Cty.,* 387 U.S. 105, 107-08 (1967). The wisdom of state delegations of a portion of their authority to local government has long been

11

recognized. "Their judgment of local needs is made from a more intimate knowledge of local conditions than that of any other legislative body." *Breard v. City of Alexandria, La.,* 341 U.S. 622, 641 (1951), *abrogated* on other grounds by *Vill. of Schaumburg v. Citizens for a Better Env't.*, 444 U.S. 620 (1980).

Ordinance 300 identified its twin purposes as regulating commerce within the County and promoting economic development within the County — both of which are authorized by KRS 67.083. (*See* Ordinance 300, p. 1 & § 1, RE 5-1, Page ID # 95-96.) Section 2 of the Ordinance identifies the County's public policies furthered by the Ordinance as the regulation of commerce through promoting freedom for the County's citizens in their choice of employment and how they spend their paychecks. (*Id.* § 2, Page ID # 96.)

Another public policy identified in Section 2 of Ordinance 300 is to "encourage an employment climate conducive to the economic development of Hardin County." (*Id.*) "Right-to-work" has long been associated with economic development.[12] Hardin County is located on the U.S. Interstate 65 ("I-65")

---

[12] "There are some remarkable facts about what has happened to manufacturing in the right-to-work states over the postwar period. Manufacturing employment in the states without right-to-work laws is virtually the same today as it was in 1947. In the right-to-work states, manufacturing employment increased 150 percent." Thomas J. Holmes, *The Effect of State Policies on the Location of Manufacturing: Evidence from State Borders,* 106, No. 4 Journal of Political Economy 667, 669 (1998). Dr. Holmes holds the Curtis L. Carlson Chair in Economics at the University of Minnesota. He joined the Federal Reserve Bank of Minneapolis as an

Corridor and must compete for jobs and other economic development opportunities with communities along the I-65 Corridor in Indiana to the north and Tennessee to the South. (Defs.' Answer ¶ 15, RE 5, Page ID # 78.)  Both Indiana and Tennessee have enacted right-to-work laws. (*Id.*; *see also* Tenn. Code Ann. §§ 50-1-201 to -208; Ind. Code Ann. §§ 22-6-6-1 to -13.)  The current construction of two new bridges across the Ohio River between Indiana and Kentucky only increases the competition for economic development opportunities between Hardin County and communities located across the border in Indiana. (*Id.*).

Kentucky counties vary widely in both their geography and their primary contributors to the local economy.  Rural counties with economies fueled by agricultural and small business may care little about "right to work."  Similarly, Kentucky counties located neither adjacent to nor closely connected via Interstate highways with "right-to-work" jurisdictions may feel little competition for jobs due to the absence of "right-to-work" protections for their citizens.  Ordinance 300 explains, however, that "Hardin County and its residents compete for the expansion of employment opportunities with other cities, counties and states whose

---

economist in 1993. He is currently a visiting scholar in the Research Department. He previously taught at the University of Wisconsin–Madison.

citizens benefit from the protections under similar right-to-work legislation."
(Ordinance 300 , p. 1, RE 5-1, Page ID # 95.)

### D. The District Court erroneously concludes that Ordinance 300 is preempted by the National Labor Relations Act.

On January 14, 2015, various unions filed a Complaint against Hardin County and both Democratic and Republican county officials, named in their official capacity, alleging that Ordinance 300 was preempted by the NLRA.[13] (Compl.. p. 1, RE 1, Page ID # 1.)   The Complaint sought preliminary and permanent injunctions prohibiting the enforcement of Ordinance 300. (*Id.* at 10-11, Page ID # 10-11.)  An Amended Complaint was filed on April 3, 2015, making the same allegations and seeking the same relief.  (Am. Compl., RE 15, Page ID # 209-219.)  The parties, agreeing that there was no genuine issue of material fact and that this case presented a pure question of law, filed cross-motions for summary judgment.  (Pls.' Mot. Summ. J., RE 7 & 7-1, Page ID # 100-121; Defs.' Mot. Summ. J., RE 16 & 16-1, Page ID # 220-253.)  After the motions were fully briefed, the District Court conducted an oral argument on August 4, 2015.  (Memo. Of Hr'g, RE 42, Page ID # 1276.)

On February 3, 2016, the District Court issued a Memorandum Opinion and Order granting the Union's Motion for Summary Judgment and denying Hardin

---

[13] The Plaintiffs-Appellees will be hereinafter referred to as "the Unions," and Defendants-Appellants will be hereinafter referred to as "Hardin County."

County's Motion for Summary Judgment.  (Mem. Opin. & Ord., RE 43, Page ID # 1277-1290.)  The Court entered a corresponding Judgment on February 3, 2016, in favor of the Unions and against Hardin County which ordered that "Sections 4, 5, and 6 of Hardin County Ordinance No. 300, Series 2014, are preempted by the NLRA and are therefore declared void and unenforceable," and further ordered that "Defendants, their successors, and their representatives are permanently **ENJOINED** from taking any action to enforce section 4, 5, or 6 of Ordinance 300."  (Judgment, RE 44, Page ID # 1291.)

In finding that Ordinance 300 was preempted by the NLRA, the District Court asserted four key, though erroneous, conclusions which Hardin County challenges as part of this appeal.  First, the District Court held that, although Section 14(b) of the NLRA plainly allows states and territories to adopt laws regulating compulsory unionism, the term "State" as used within Section 14(b) does not include counties and that Ordinance 300 was, therefore, preempted.  (Mem. Opin. & Ord., p. 7, RE 43, Page ID # 1283.)  Second, the District Court held that Section 8(a)(3) of the NLRA "protects union-security agreements . . . [t]hus, barring any exceptions, state and local regulation of union-security agreements is preempted by the NLRA."  (*Id.* at 11, Page ID # 1287.)  Third, the District Court concluded that the NLRA preempts Ordinance 300's hiring-hall provision "[b]ecause hiring halls do not compel union membership[.]"  (*Id.* at 13,

15

Page ID # 1289.)    Finally, the District Court declared that the dues checkoff provision of Ordinance 300 was preempted because "§ 14(b) permits state regulation only as to forms of union security which are the practical equivalent of compulsory unionism, and that dues checkoff provisions do not amount to compulsory unionism."  (*Id.* at 14, Page ID # 1290 (quotation omitted).)

## SUMMARY OF ARGUMENT

Section 14(b) expressly disclaims preemption of state laws prohibiting compulsory unionism.  The District Court's conclusion that this non-preemption provision nevertheless preempted Hardin County's right-to-work ordinance, enacted with delegated state-law authority, was error.

Whenever Congress recognizes the power of States to enact laws, this includes the authority of States to delegate their law-making powers to their political subdivisions, like Hardin County. The "number, nature and duration of the powers conferred upon [a political subdivision] and the territory over which they shall be exercised rest in the absolute discretion of the State." *Sailors,* 387 U.S. at 108; *See, also Mortier*, 501 U.S. at 607-08; *Nixon v. Missouri Mun. League*, 541 U.S. 125, 140 (2004). Furthermore, "a political subdivision may exercise whatever portion of state power the State, under its own constitution and laws, chooses to delegate to the subdivision."  *Ours Garage*, 536 U.S. at 428-29. For this reason, local ordinances are "analyzed in the same way as that of state-wide law" to

16

determine whether they are preempted under the Supremacy Clause. *Mortier*, 501 U.S. at 601.

Where federal law does not preempt state law, the States' political subdivisions, like Hardin County, are likewise free to act unless Congress expresses a "clear and manifest purpose to preempt local authority." *Ours Garage*, 536 U.S. at 432; *Mortier*, 501 U.S. at 607-08. *Sailors,* 387 U.S. at 107-08. This Supreme Court formula for determining whether federal law preempts a local law has obvious application to Hardin County's right-to-work Ordinance.  The NLRA does not preempt State right-to-work laws. Therefore, the NLRA cannot preempt Hardin County's right-to-work law unless Congress expressed in the NLRA "a clear and manifest purpose to preempt local authority."*Ours Garage*, 536 U.S. at 429; *Mortier*, 501 U.S. at 607. Nowhere does the NLRA reveal a "clear and manifest purpose to preempt local authority."

The NLRA contains no statement of "clear and manifest purpose to preempt" ***any*** right-to-work law. The NLRA's ***only*** statement on preemption is Section 14(b)'s express protection of "State or Territorial Law" from any claim of federal preemption. The District Court concluded that the silence of Section 14(b) on the subject of preemption for local right-to-work laws imposed federal preemption on Ordinance 300. Supreme Court precedent mandates the exact opposite conclusion. The Supreme Court admonishes that "mere silence" on the

17

subject of the preemption of local statutes "cannot suffice to establish a 'clear and manifest purpose' to pre-empt local authority." *Ours Garage*, 536 U.S. at 429; *Mortier*, 501 U.S. at 607. The Supreme Court's logic is irrefutable:

> The exclusion of political subdivisions [like Hardin County] cannot be inferred from the express authorization to the 'State[s]' because political subdivisions are components of the very entity the statute empowers.

*Id*.

Accordingly, Section 14(b)'s protection of "State" authority to adopt right-to-work laws also protects the delegated authority of a States' political subdivisions, like Hardin County, to adopt right-to-work laws. As the Supreme Court explains, a congressional reference protecting state law from preemption "should be read to preserve, not preempt, the traditional prerogative of the States to delegate their authority to their constituent parts." *Ours Garage*, 536 U.S. at 429. In short, Section 14(b) preserves Hardin County's right to enact Ordinance 300 pursuant to its authority to regulate commerce and promote economic development delegated to the County by the Commonwealth of Kentucky.

The District Court also improperly concluded that Section 8(a)(3) preempts all compulsory-unionism laws, and Section 14(b) represents the only "exception" to such preemption.  This conclusion is based upon the faulty assumption that Section 8(a)(3) "protects union-security agreements."  (Mem. Opin. & Ord., p. 11, RE 43, Page ID # 1287.)  The Supreme Court held to the contrary in *Algoma*.  In

*Algoma*, a union "argued . . . that a State cannot forbid what § 8(3) [now § 8(a)(3)]

affirmatively permits."    *Algoma*, 336 U.S. at 307. Algoma rejected the union's

argument that:

> § 8(3) merely disclaims a national policy hostile to the closed shop or
> other forms of union-security agreement. This is the obvious inference
> to be drawn from the choice of the words "nothing in this Act or in
> any other statute of the United States," and it is confirmed by the
> legislative history.

*Id.* (quoting NLRA § 8(3)).  Thus, Section 8(a)(3) provides no basis for preemption

of Ordinance 300. In fact, nothing within the NLRA creates grounds for federal

preemption of any right-to-work law.

Finally, the District Court's determination that Ordinance 300's dues

checkoff and hiring hall provisions are preempted by the NLRA is faulty. (*See*

Mem. Opin. & Ord., p. 13, RE 43, Page ID # 1289; *id.* at 14, Page ID # 1290). In

*NLRB v. Gen. Motors Corp.*, 373 U.S. 734 (1963), the Supreme Court held that the

payment of union dues is "***the practical equivalent*** of union 'membership.'"  *Gen.*

*Motors Corp.*, 373 U.S. at 743 (emphasis added).  The dues checkoff and hiring

hall provisions of Ordinance 300 merely protect Hardin County citizens from

having to pay or support a union against their will.

## ARGUMENT

## I.    Standard of Review

The District Court's Opinion and Order granting summary judgment in favor

of the Unions is reviewed *de novo*.  *Millsaps v. Thompson*, 259 F.3d 535, 537 (6th

Cir. 2001). The issues in this appeal present pure questions of law and there are no disputed questions of fact.

## II.    The NLRA does not preempt state or local right-to-work laws.

The Supremacy Clause of the United States Constitution gives Congress the authority to preempt state law. U.S. CONST. art. VI cls. 2.[14] The Supremacy Clause makes no mention of local laws. This is because local governments are simply political subdivisions of the States that created them. *Ours Garage*, 536 U.S. at 428-29; *Mortier*, 501 U.S. at 607-8; *Lexington Urban County Gov't.*, 142 S.W.3d at 133. For this reason, local ordinances are "analyzed in the same way as that of state-wide laws" under the Supremacy Clause. *Mortier,* 501 U.S. at 605.

Federal law recognizes a presumption against preemption. *Maryland v. Louisiana,* 451 U.S. 725, 746 (1981) ("Consideration under the Supremacy Clause starts with a basic assumption that Congress did not intend to displace State law.") Preemption occurs only where Congress intended federal law to displaces State or local law. Courts have recognized that such preemption can arise in one of three ways:

---

[14] The Supremacy Clause states: "Clause 2. This Constitution, and the laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the Supreme Law of the Land; and the Judges in every State shall be bound thereof; any Thing in the Constitution or Laws of any States to the Contrary notwithstanding."

1.    An express preemption of State or local law embodied in the federal statute.

2.    An implied preemption arising from a conflict between federal law and State or local law.

3.    An implied preemption through pervasive regulation of an entire field of law.

*English v. General Electric Company*, 496 U.S. 72, 78-79 (1990). "Conflict preemption" has two types: (i) a state or local law may create a conflict with a federal law by rendering it impossible to comply with both the federal law and the state or local law simultaneously, and (ii) a State or local law may "stand as an obstacle" to achieving the objectives Congress intended by passing the federal law. *Gade v. National Solid Wastes Management Ass'n.*, 505 U.S. 88, 98 (1992).

## A.    The NLRA contains no express preemption of right-to-work laws.

The NLRA contains no express preemption of right-to-work laws. Section 8(a)(3) only provides that "nothing in this Act, or any other statute of the United States," will forbid compulsory unionism. NLRA Section 8(a)(3), 29 U.S.C. § 158(a)(3). The Act carefully avoids any statement that state or local laws cannot forbid compulsory unionism.

The NLRA's only express statement on the subject of preemption is Section 14(b)'s express disclaimer of any intent to preempt right-to-work laws established "by State or Territorial law." NLRA Section 14(b), 29 U.S.C. § 164(b). As described fully below, Section 14(b)'s protection of State right-to-work laws

21

applies equally to Hardin County's Ordinance 300. For the present purpose, it is sufficient to state the obvious. Section 14(b) excludes preemption. It does not create preemption. The NLRA contains no express preemption.

### B.    The NLRA creates no conflict preemption with right-to-work laws.

The NLRB also creates no conflict preemption with right-to-work laws. The NLRA has coexisted with right-to-work laws throughout its entire history. Section 8(a)(3) states that compulsory unionism will be safe only from prohibition by the NLRA or other federal law. The NLRA creates no expectation that any other governmental unit cannot forbid compulsory unionism. And, to the extent it was in doubt (which it was not), Section 14(b) makes crystal clear that right-to-work laws do not "stand as an obstacle" to achieving Congress' purposes in passing the NLRA. Right-to-work laws are not "in conflict" with the NLRA. This leaves only the question of whether the NLRA creates an "implied preemption" of right-to-work laws due to pervasive regulation of "the entire field." It does not.

### C.    "Field Preemption" does not apply to Ordinance 300.

The District Court's decision rests on three erroneous conclusions. All three are related to "field preemption." These erroneous conclusions are:

1. The NLRA preempts the field of right-to-work laws;

2. Section 14(b) creates only a "narrow exemption" to this field preemption for "State and Territorial law;" and

22

3. Ordinance 300 is not treated as a "state law" for preemption purposes. (Mem. Opin. & Ord., p. 7, RE 43, Page ID #1283, p. 11, Page ID # 1287; and p. 14, Page ID #1290). Each of these conclusions is in error.

The NLRA does not preempt the field of right-to-work laws. Section 8(a)(3) of the NLRA merely "disclaims a national policy hostile to . . . union-security agreement(s)." *Algoma,* 336 U.S. at 307. Section 14(b) makes "clear and unambiguous the purpose of Congress *not* to preempt the field." *Schermerhorn*, 375 U.S. at 101 (emphasis added). And, even if Section 14(b) was an "exception" to federal preemption of right-to-work laws, this exception would apply to Ordinance 300. Hardin County is a "component of the very entity [the Commonwealth of Kentucky] that the statute [Section 14(b)] empowers." *Ours Garage*, 536 U.S. at 433; *Mortier*, 501 U.S. at 607-608.

## 1.    The NLRA does not preempt the field of right-to-work laws.

The District Court erroneously concluded that "barring any exceptions, state and local regulation of union-security agreements is preempted by the NLRB." (Mem. Opin. & Ord., p. 11, RE 43, Page ID # 1287.) The District Court draws this erroneous conclusion from the mistaken belief that "Section 8(a)(3) protects union-security agreements" from state and local regulation. *Id.* In short, the District Court held that Section 8(a)(3) preempts the "field" of regulating compulsory unionism. This is not the case.

23

Both the plain language of Section 8(a)(3) and controlling Supreme Court precedent contradict the District Court's conclusion. Section 8(a)(3) only protects union-security agreements from "this Act . . . or any other statue of the United States." NLRA § 8(a)(3); 29 U.S.C. § 158(a) (2016). And, the Supreme Court has twice made clear that, although federal labor law impliedly preempts the field of regulation of many aspects of labor relations,[15] compulsory unionism is **not** one of them.

The U.S. Supreme Court addressed the purpose and effect of Congress' proviso on compulsory unionism, now designed Section 8(a)(3), in *Algoma*.[16] Wisconsin law forbid the employer to discriminate against employees who were not union members.[17] Employee, Victor Moreau refused to pay union dues. The

---

[15] Please see footnote 7, page 8, for examples of other labor relations matters of local concern that the Supreme Court has held are not preempted by the NLRA.

[16] *Algoma* interpreted the original 1935 Wagner Act language because the dispute at issue in *Algoma* arose prior to the amendment of the NLRA by the *Taft-Hartley Act* in 1947. Importantly, however, *Algoma* stated that the NLRA, as amended by the Taft-Hartley amendments, also creates no preemption of right-to-work laws. *Algoma Plywood & Veneer Co.*, 336 U.S. at 305 ("(W)e do not find any conflict between the Wisconsin law under . . . either the National Labor Relations Act or the Taft-Hartley Act. . . .").

[17] The Wisconsin law forbid discrimination on the basis of union support or non-support unless a two-thirds majority of employees voted by secret ballot in favor of an "all union" workforce. No such vote had occurred at this employer. Therefore, the employer's agreement with the union to require its employee, Mr. Moreau, to pay union dues or lose his job violated Wisconsin law. *Id.* at 304

union demanded that Moreau be fired. Pursuit to its agreement with the union, the company fired Moreau. *Id. at* 303-04.

Wisconsin sought to enforce its law and return Victor Moreau to his job. The company and the union defended the termination of Mr. Moreau by asserting that the NLRA preempted Wisconsin's law prohibiting compulsory unionism at Mr. Moreau's workplace. The United States Supreme Court granted certiorari "because of the important bearing of these issues upon the distribution of power in our federal system." *Id.* at 304.

In upholding the Wisconsin law, Justice Frankfurter explained why the argument for preemption was (and is) erroneous. *Id.* at 307. The union and company argued that the NLRA "affirmatively permits" compulsory unionism, and therefore "a State cannot forbid what s 8(3) [now, 8(a)(3)] affirmatively permits." *Id.* The Supreme Court rejected this contention. Justice Frankfurter explained that Section 8(3) of the NLRA merely declares neutrality on the subject of compulsory unionism. It does not affirmatively protect or endorse it. In Justice Frankfurter's words:

> The short answer [to the preemption argument] is that s 8(3) merely disclaims a national policy hostile to the closed shop or other forms of union-security agreement. This is the obvious inference to be drawn from the choice of the words "nothing in this Act . . . or in any other statute of the United States" and it is confirmed by the legislative history.

*Id.* Justice Frankfurter went on to observe that Section 8(3) did "nothing to facilitate close-shop agreements or to make them legal in any State where they are illegal; it does not interfere with the status quo on this debatable subject. . . ." *Id.* at 308.

Justice Frankfurter's *Algoma* opinion plays an important role in the law applicable to the issue before this Court. *Algoma* establishes that the NLRA creates no federal preemption over non-federal laws forbidding compulsory unionism. This remains true today. The language of the NLRA that *Algoma* interpreted remains unchanged to this day. *Algoma* has never been overruled. Rather, it has been reaffirmed.

The relationship between the NLRA and right-to-work laws came before the Supreme Court again in *Retail Clerks Intern. Ass'n., Local 1625, AFL-CIO v. Schermerhorn, supra.* Two legal development had intervened since the dispute decided in *Algoma.* Firstly, the Taft-Hartley Amendments now established some federal regulation of compulsory unionism, through outlawing Closed Shop agreements. Secondly, the Supreme Court had ruled, in 1959, that the NLRA creates broad federal preemption over the field of regulating "activity … arguably within the compass of s 7 or s 8 of the Act." *San Diego Bldg. Trades Council v. Garmon,* 359 US. 236, 246 (1959). Did either of these developments place right-

to-work laws within the scope of federal preemption? The Supreme Court answered, "no." *Schermerhorn* 375 U.S. at 104.

As explained earlier, the Taft-Hartley Amendments prohibited closed shop. To make sure this prohibition was not misinterpreted as preempting the field of regulation of compulsory unionism, Congress added Section 14(b). Congress' purpose in adding Section 14(b) is not in doubt. It was merely a clarifying provision that in no way changed preexisting law:

> Senator Taft in the Senate debates stated that § 14(b) was to continue the policy of the Wagner Act and avoid federal interference with state laws in this field. As to the Wagner Act he stated, "But that did not in any way prohibit the *enforcement of State laws* which already prohibited closed shops." He went on to say, "That has been the law ever since that time. It was the law of the Senate bill; and in putting in this express provision from the House bill, [§ 14(b)] we in no way change the bill as passed by the Senate of the United States."

*Id.* at 101-02 (quoting 93 Cong. Rec. 6520, 6679 (June 6, 1947)) (emphasis in original) (parenthetical and footnotes omitted). Accordingly, the Supreme Court restated again that the NLRA creates no preemption of right-to-work laws. *Id.* at 101-105.

Reaffirming *Algoma,* the Court observed that "Congress . . . may **even by silence** indicate a purpose to let state regulation be imposed on the federal regime." *Id.* (emphasis added). And, Congress had added Section 14(b) to the Act only, "to continue the policy of the Wagner Act and avoid federal interference with state laws in this field (of right-to-work laws)." *Id.* at 102.

27

As for *Garmon* preemption, the Court ruled that it had no application to right-to-work laws. Since the purpose of Congress was "to let state regulation (of compulsory unionism) be imposed on the federal regime" of labor relations, *Garmon* preemption did not apply. *Id.* at 103-04.

But, what about *Garmon* preemption? The Supreme Court set out the farthest reaches of NLRA "field preemption" in *Garmon*. *Garmon* established that the National Labor Relations Board ("NLRB") had exclusive jurisdiction over activity that is "arguably subject to § 7 or § 8 of the [NLRA]." *Id.* at 245. Subsequently, the U.S. Supreme Court cautioned that "inflexible application of the [*Garmon* preemption] doctrine is to be avoided. *Farmer v. Carpenters Local 25,* 430 U.S. 292, 302-06 (1977). Nevertheless, *Garmon* establishes NLRA preemption over many aspects of labor-management relations. Is right-to-work among them? The supreme Court answered, "no." *Schermerhorn*, 375 U.S. at 103-04.

*Schermerhorn* addressed Florida's right-to-work law. The sole question before the Court was whether the NLRB or Florida state courts had jurisdiction to enforce Florida's right-to-work law. A group of employees challenged in Florida state court their union contract's provision requiring that they pay union dues. The employer and the union asserted NLRA preemption, pursuant to *Garmon*. This would give the NLRB exclusive jurisdiction to interpret and enforce right-to-work laws. *Id.* at 97-98 & 103.

28

*Schermerhorn* held that *Garmon* preemption has no application to "right-to-work" laws. *Id.* at 103-104.  The Supreme Court acknowledged that "this result on its face might seem at war with [*Garmon*] which requires that state and federal courts 'defer to the exclusive competence of the National Labor Relations Board.'" *Id.* at 103. The Court rejected, however, the union/employer argument that *Garmon* applied to right-to-work laws. *Id.* at 103-104.

The Supreme Court explained that "(t)he purpose of Congress is the ultimate touchstone" for preemption questions. *Id.* And, as to compulsory unionism, it was Congress' "purpose to let state regulation be imposed on the federal regime." *Id. at 104.* Congress had made clear that it had no intention of preempting right-to-work laws. *Id.*

In reliance upon *Algoma, the* Court pointed to the "special legislative history of the union-security provisions of the Act." *Id.* at 104.  The Court, then observed that Section 14(b) of the NLRA "was included to forestall the inference that federal policy was to be exclusive on this matter of union-security agreements." *Id.* (quoting *Algoma,* 336 U.S. at 314). *Schermerhorn* concluded that *Garmon* "field" preemption has no application to right-to-work laws, and similar regulations of "union security agreements." *Schermerhorn,* 375 U.S. at 103-104; *See also, Algoma*, 336 U.S. at 306-312.

29

### 2. Section 14(b) is not a "narrow exception" to "field" preemption of right-to-work laws, but an affirmation that Section 8(a)(3) was never intended to be preemptive.

The District Court's erroneous conclusion that *Garmon* "field" preemption applies to right-to-work laws led the Court to erroneously conclude that Section 14(b) is only a "narrow exception" to federal preemption of right-to-work laws.

"What Congress has not taken away by § 8(a)(3) it need not give back by § 14(b) . . . ." *NLRB v. Pueblo of San Juan*, 276 F.3d 1186, 1197 (10th Cir. 2002) (parentheses omitted) (*en banc*). Recognizing this, the Tenth Circuit upheld the validity of a tribal right-to-work ordinance even though no reference is made in Section 14(b) to tribal law. The court did so because "*§ 8(a)(3) was not intended by Congress to be preemptive*." *Id.* (emphasis added). Therefore, the tribe did not need to rely upon Section 14(b) as authority for adopting its ordinance because Section 8(a)(3) did nothing to preempt right-to-work laws — Congress need not "give back" that which it has "not taken away." *Id.* Similarly, Hardin County does not need Section 14(b) in order for Ordinance 300 to be declared valid. The lack of any preemptive force of Section 8(a)(3) is sufficient.

The District Court too quickly discounted the *Pueblo of San Juan* decision. (Mem. Opin. & Ord. p. 11 n.5, RE 43, Page ID # 1287.) The Tenth Circuit's holding that "*§ 8(a)(3) was not intended by Congress to be preemptive*," *id.* (emphasis added), is in no way based upon an analysis unique to tribal law, as the

District Court stated. Rather, it is based upon the Tenth Circuit's evaluation of decisions of the Supreme Court interpreting the NLRA. *See Pueblo of San Juan,* 276 F.3d at 1201 ("the result reached today is mandated by two United States Supreme Court cases, [*Schermerhorn*] and [*Algoma*]. These cases do not permit us to entertain the interpretation or result advocated by appellants in this case.").

In cases directly addressing the issue of preemption of right-to-work laws, the Supreme Court recognized that it was never the purpose of Congress to preempt the field. *Schermerhorn*, 375 U.S. at 101 n.9 ("'It was never the intention of the NLRA to preempt the field in this regard so as to deprive the States of their powers to prevent compulsory unionism.'") (quoting H.R. Rep. No. 510, at 60 (1st Sess. 1947)); *Algoma*, 336 U.S. 307 (concluding that Section 8(3) (now Section 8(a)(3)) "merely disclaims a national policy hostile to the closed shop or other forms of union-security agreement."). Rather than relying upon these dispositive Supreme Court decisions, the District Court instead relied upon ambiguous dicta contained in the Supreme Court's decision in *Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO v. Mobil Oil Corp.*, 426 U.S. 407 (1976).

*Mobil Oil* addressed whether Texas' right-to-work law could apply to unlicensed seamen who worked, not in Texas, but on oil tankers on the high seas. The Court found that the Texas law did not apply, as "the employees' predominant

job situs should determine the applicability of a State's right-to-work laws." *Mobil Oil Corp.*, 426 U.S. at 418.

*Mobil Oil* did not involve, address, or apply to local right-to-work ordinances. Nevertheless, the District Court relied upon a footnote contained in the *Mobil Oil* decision. In footnote 7 of the *Mobil Oil* decision, the Supreme Court commented that "[t]here is nothing in either § 14(b)'s language or legislative history to suggest that there may be applications of right-to-work laws which are not encompassed under s 14(b) but which are nonetheless permissible," *id.* at 413 n.7, pointing to the District Court stated that this "analysis in *Mobil Oil* was premised on the assumption that only a right-to-work law covered by § 14(b) can be valid." (Mem. Opin. & Ord., p. 8, RE 43, Page ID # 1284.) The District Court concluded from this footnote that § 14(b) is the sole source of authority for right-to-work laws." (*Id.*)

Nowhere in the *Mobil Oil* decision, however, did the Supreme Court rule that Section 14(b) is "the sole source of authority for right-to-work laws." In fact, the Supreme Court recognized that Section 8(a)(3) is an ***additional*** source of right-to-work laws: "§ 14(b) was designed to make clear that ***§ 8(a)(3) left the States free to pursue 'their own more restrictive policies in the matter of union-security agreements***.'" *Id.* at 417 (quoting *Algoma*, 336 U.S. at 314) (emphasis added). Thus, whatever the Court meant by its ambiguous statement in footnote 7 of the

32

*Mobil Oil* case, it certainly did not mean that Section 14(b) was the sole authority for right-to-work laws.

In any event, footnote seven of the *Mobil Oil* decision is dicta because that footnote is neither "the result" of the decision, nor a "portion[] of the opinion necessary to that result." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996). The only issue before the Court was the test that should be applied to determine whether an employment relationship has a sufficient enough connection with a particular jurisdiction for that jurisdiction to enforce its right-to-work laws. Whether Section 14(b) is the sole source of authority for right-to-work laws is simply not a portion of the decision that was necessary to the Court's holding.

In its Opinion and Order the District Court found that "the NLRA ***protects*** union-security agreements." (Mem. Opin. & Ord., p. 11, RE 43, Page ID # 1287.) The Supreme Court in *Algoma* already addressed this specific assertion and rejected it. There, "[i]t [was] argued . . . that a State cannot forbid what § 8(3) affirmatively permits." *Algoma*, 336 U.S. at 307. "The short answer," according to the Court was that

> § 8(3) merely disclaims a national policy hostile to the closed shop or other forms of union-security agreement. This is the obvious inference to be drawn from the choice of the words "nothing in this Act or in any other statute of the United States," and it is confirmed by the legislative history.

*Id.* (quoting NLRA § 8(3)). [18]   In other words, "[w]hat Congress has not taken away by § 8(a)(3) it need not give by (by § 14(b)) in order for the [locality] to continue to have authority to pass a right-to-work law." *Pueblo of San Juan*, 276 F.3d at 1197.

## III.    Section 14(b) of the NLRA expressly exempts Ordinance 300 from preemption.

For the reasons described above, the District Court erred in treating Section 14(b) as a "narrow exception" to a non-existing NLRA preemption of the "field" of right-to-work laws. Even if this portion of the District Court's analysis had been correct, however, the NLRA would still not preempt Ordinance 300. Section 14(b) expressly disclaimed preemption of state right-to-work laws, and Supreme Court precedent requires that Ordinance 300 be treated as "state law" for purposes of federal preemption.

Hardin County is a "political subdivision" of the Commonwealth of Kentucky. *Lexington-Fayette Urban Cnty. Gov't*, 142 S.W.3d at 133. Whenever States are free from federal preemption, their political subdivisions are likewise

---

[18] If Congress had intended the NLRA to "protect union-security agreements," the NLRA would read like the Railway Labor Act ("RLA"). The RLA's equivalent of the NLRA's Section 8(a)(3) is RLA Section 2, Eleventh. It reads "(n)ot withstanding any other provisions of this chapter, or of any other statute or law of the United States, or Territory thereof, ***or of any State***, any carrier . . . and a labor organization" . . . can enter into a union security agreement. Railway Labor Act § 2, Eleventh (codified at 45 U.S.C. § 152, Eleventh) (emphasis added). *See, Beck*, 487 U.S. at 745 n.3 ("§ 2, Eleventh pre-empts state laws that would otherwise ban union shops.").

free from federal preemption, absent Congress expressing a "clear and manifest purpose to preempt local authority." *Mortier,* 501 U.S. at 607; *See also, Ours Garage,* 536 U.S. at 433. Nowhere in the NLRA did Congress express any "clear and manifest purpose to preempt local authority" from adopting a right-to-work law. Accordingly, Hardin County is free to use its state delegated authority to adopt a right-to-work law.

### A. States can delegate their lawmaking authority to adopt right-to-work laws to their political subdivisions.

The Supreme Court articulated in *Wisconsin Public Intervenor v. Mortier,* 501 U.S. 597 (1991), the legal principle applicable to whether Section 14(b) includes local laws within the definition of "state law." The Supreme Court unanimously ruled that the preservation of "States'" regulatory authority over a particular subject also preserves the delegated authority of states' political subdivisions to regulate on the same subject. This is true notwithstanding the absence of any reference to "political subdivisions" within the NLRA's definition of "States." *See, Id.* at 607-08.

*Mortier* involved the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA). The FIFRA created an expansive regulatory scheme for pesticides, but nonetheless reserved the power of "States" to also "regulate the sale or use of pesticides so long as the state regulation does not permit a sale or use prohibited by

the [FIFRA] Act." *Id.* at 602. The *Mortier* Court held this statute preserves the regulatory power of political subdivisions, as well as States.

The Court adopted this rule because counties and other political subdivisions are merely agencies of the State to which they belong. When political subdivisions, like Hardin County, exercise powers that the State delegated to them, their laws are "state law" for preemption purposes. The Supreme Court explains:

> The principle is well settled that local "governmental units are created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them . . . in [its] absolute discretion."  The exclusion of political subdivisions cannot be inferred from the express authorization to the "State[s]" because political subdivisions are components of the very entity the statute empowers.

*Id.* at 607-08 (citations omitted).  Before local authority will be preempted, a "clear and manifest" statement of purpose to preempt local laws is required — silence is inadequate:

> [FIFRA] plainly authorizes the "States" to regulate pesticides and just as plainly is silent with reference to local governments. Mere silence, in this context, cannot suffice to establish a "clear and manifest purpose" to pre-empt local authority.

*Id.* at 607 (citation omitted).

The fact that other parts of FIFRA referred to "any State or any political subdivision thereof," did not dissuade the Court from its conclusion that the authority granted the "States" to regulate pesticides includes the State's political subdivisions. The Court ruled that the use of the term "political subdivision" in

various parts of a Congressional Act is insufficient to establish a "clear and manifest purpose" to preempt local authority, even though the use of such phrase is arguably redundant:

> The term "State" is not self-limiting since political subdivisions are merely subordinate components of the whole.  The scattered mention of political subdivisions elsewhere in FIFRA does not require their exclusion here.

*Id.* at 612.

The U.S. Supreme Court resoundingly reaffirmed the principles of *Mortier* in *City of Columbus v. Ours Garage & Wrecker Service, Inc.,* 536 U.S. 424 (2002). The *Ours Garage* case involved the Interstate Commerce Act ("ICA"). The ICA contains an express preemption provision prohibiting "a State" or a "political subdivision of a State" from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property."  *Ours Garage*, 536 U.S. at 429 (quoting 49 U.S.C. § 14501(c)(1)).  However, the ICA sets forth two relevant exceptions to preemption, one of which referred only to "States" and the other referred to both "State" or political subdivision.  The ICA's preemption provision:

> (A) shall not restrict the safety regulatory authority of ***a State*** with respect to motor vehicles; [and]
>
> (C) does not apply to the authority of ***a State or a political subdivision of a State*** to enact or enforce a law . . . relating to the

37

> price of for-hire motor vehicle transportation by a tow truck if such transportation is performed without the prior consent or authorization of the owner or operator of the motor vehicle.

*Id.* (quoting § 14501(c)(2)) (emphasis added).

The City of Columbus adopted extensive regulations governing the operation of tow trucks. The regulations were not limited to tow trucks that transport vehicles without the owner's consent and, therefore, did not fall within § 14501(c)(2)(C)'s express exception applicable to a "political subdivision of a State."

Consistent with its opinion in *Mortier*, the United States Supreme Court ruled that the ordinance was within the exception to preemption in (A), even though that provision, unlike (C), only applied to state law. The Court held that the exclusion of "political subdivisions" from the grant of authority to States to regulate safety "does not provide the requisite 'clear and manifest indication that Congress sought to supplant local authority.'" *Id.* at 434. By ruling that the ICA's use of the term "State" included its political subdivisions under these circumstances, the Supreme Court illustrated just how "clear" a statute must be to free the States from federal preemption, but shackle political subdivisions with federal preemption.

**B.    Ordinance 300 falls squarely within the definition of "State or Territorial law" as used in Section 14(b).**

*Mortier* and *Ours Garage* compel the conclusion that Ordinance 300 is the very type of law that is authorized by Section 14(b).[19]   Section 14(b) expressly states that the NLRA does not preempts "state" laws protecting right-to-work laws. Nothing in the language of § 14(b) expressly excludes political subdivisions, as required by *Mortier* and *Ours Garage* to create local preemption. Section 14(b)'s reference to "state" law includes ordinances adopted by political subdivisions pursuant to delegated state law authority.

The NLRA contains only a single reference to "political subdivisions" of the States.   It is found at Section 2(2).   29 U.S.C. § 152(2).   This provision specifies that for purposes of the NLRA, an "employer" does not encompass "any State or political subdivision thereof."   This reference was necessary because a State and a political subdivision, when treated as employers, are two distinct corporate entities. Congress' determination that States and political subdivisions were not subject to the NLRA as "employers" does not lead to any implication that Congress preempted local right-to-work laws.

---

[19] The title of Section 14 is "Construction of Provisions."   The Section does not affect any positive law.   The purpose of the Section is to give instructions for the proper reading of the NLRA.   It instructs anyone reading the NLRA not to interpret any part as depriving the States of their power to regular union-security agreements.   NLRA § 14(b) (codified at 29 U.S.C. § 164(b)).

39

Compare the ICA with the NLRA. The NLRA nowhere states an intention to preempt State or local "right-to-work" laws. Just the opposite. Section 8(a)(3), by its plain language, excludes only the NLRA and "other statutes of the United States" from prohibiting compulsory unionism. Unlike the ICA, the NLRA contains no parallel grant of a different type of exception to federal preemption for "State" versus "States and political subdivisions." If the Interstate Commerce Act provides no "clear and manifest indication that Congress sought to supplant local authority," the NLRA certainly contains no such indication as to right-to-work laws.

Thus, although the ICA in *Ours Garage* and the FIFRA in *Mortier* both contained various references to States and their political subdivisions throughout the statutes, the Supreme Court had no difficulty concluding that the exemption permitting "States" (with no mention of political subdivisions) fully authorizes local ordinances on the subject that would otherwise be preempted by the federal statute. The same is true for the NLRA.

**1. The principle that the term "State" includes political subdivisions is rooted in fundamental principles of federalism, and applies outside the FIFRA and ICA.**

The District Court erroneously concluded that *Mortier* and *Ours Garage* do not apply because "the term 'State' was used in a different context in FIFRA and the ICA than in the NLRA[.]" (*Id.* at 7, Page ID # 1283):

40

> Unlike the statutes analyzed in *Mortier* and *Ours Garage*, the term 'State' in § 14(b) is not used in an express grant or acknowledgment of states' regulatory authority. Rather, it identifies the political entities whose right-to-work laws withstand the NLRA.

(*Id.*)  The District Court's rationale creates a distinction without a difference.  After all, recognizing that a state's regulation of compulsory unionism "withstand[s] the NLRA" is simply another way of saying that the NLRA includes an "acknowledgment of states' regulatory authority." Since the NLRA acknowledges that states are free to adopt right-to-work laws, counties are also free from federal preemption "[a]bsent a clear statement to the contrary." The NLRA contains no "clear statement to the contrary." *Ours Garage¸* 536 U.S. at 428-9.

More troubling, however, is the District Court's erroneous assumption that the holdings in *Mortier* and *Ours Garage* were limited to the specific statutory language at issue in those cases.  On the contrary, the Court in *Mortier* and *Ours Garage* announced broad principles of federalism that must be applied whenever the relevant statutory language makes reference to a "State" or "State law."  When the federal government recognizes that States have the power to regulate, Congress is extremely reluctant to tell the States how they may exercise their own power. *See, e.g., Nixon v. Missouri Mun. League*, 541 U.S. 125, 140 (2002) (discussed below).

The principle underlying the holdings in *Mortier* and *Ours Garage* — i.e., that "local governmental units are created as convenient agencies for exercising

41

such of the governmental powers of the State as may be entrusted to them *in its absolute discretion,"* *Mortier*, 501 U.S. at 607-08 (quotation and markings omitted)(emphasis added) — holds true regardless of whether the applicable law is one that contains an express grant, or acknowledgment of states' regulatory authority, or one that simply identifies the political entities whose laws withstand federal preemption.  In each case, States are given "vast leeway in the management of its internal affairs." *Sailors*, 387 U.S. at 109.

More recently, the Supreme Court in *Nixon v. Missouri Mun. League,* 541 U.S. 125 (2002) addressed federal preemption in the context of State authority over the powers of its political subdivisions. There, a federal law imposed "preemption of state and local laws and regulations expressly or effectively 'prohibiting the ability of any entity' to provide telecommunications services." *Id.* at 128 (quoting 47 U.S.C. § 253).  A Missouri statute, which prohibited its political subdivisions from selling telecommunications services, was challenged as being preempted by federal law. *Id.* at 129.

The question before the Supreme Court was whether local municipalities were an "entity" within the meaning of the federal act.  *Id.* at 128-29.  The Supreme Court cited its decisions in *Mortier* and *Ours Garage* as standing for the proposition that there exists a "working assumption that federal legislation threatening to trench on the States' arrangements for conducting their own

42

governments should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its own power . . . ." *Id.* at 140.

Other courts have also applied *Mortier* and *Ours Garage* to the interpretation of statutes unrelated to the FIFRA and ICA. *See, e.g.*, *Fireman's Fund Ins. Co. v. City of Lodi, California*, 302 F.3d 928, 934 (9th Cir. 2002) (Comprehensive Environmental Response, Compensation and Liability Act); *Synagro-WWT, Inc. v. Rush Twp., Penn*, 204 F. Supp. 2d 827, 836, 838 (M.D. Penn. 2002) (Surface Mining Control and Reclamation Act); *Eric M. Berman, P.C. v. City of New York*, 895 F. Supp. 2d 453, 466 (E.D.N.Y. 2012), *rev'd on other grounds by* 796 F.3d 171 (2nd Cir. 2015) (Fair Debt Collection Practices Act).

Contrary to the District Court's holding, this is an issue which transcends the FIFRA, the ICA, or any particular federal statute. The authority of States to decide how to exercise their own power includes the power to delegate their power to counties, and other political subdivision, "***in (their) absolute discretion,"*** *Mortier*, 501 U.S. at 607-08.  Absent some "clear and manifest indication that Congress sought to supplant local authority," *Ours Garage*, 536 U.S. at 434, courts may not presume that Congress intended to preempt local governments from exercising the powers that their States have delegated to them. This is exactly what the District Court has done.

43

The District Court's Opinion and Order turned on statutes and parts of legislative history that are entirely *silent* on this issue of political subdivisions. They make no distinction between States and their political subdivisions. This silence falls far short of the "clear and manifest" intent mandated by the Supreme Court in *Mortier* and *Ours Garage*. *See Mortier*, 501 U.S. at 607 ("Mere silence, in this context, cannot suffice to establish a 'clear and manifest purpose' to pre-empt local authority.").

*Mortier* and *Ours Garage* stand for a principle vital to our federal system of government. This principle cannot be isolated to federal pesticide regulation or the Interstate Commerce Act. This is the error of the District Court's Opinion.

### 2. Section 14(b)'s use of the phrase "in any State" does not constitute "clear and manifest" intent to override local ordinances.

The District Court erroneously suggested that the relevance to state law in Section 14(b) cannot include local laws because Section 14(b) also uses the phrase "in any State" where compulsory unionism is "prohibited by State or Territorial Law." *See* Mem. Opin. & Ord., p. 4, RE 43, Page ID # 1280. To support this erroneous conclusion, the Court argues that it makes "little sense" to read state law as including local ordinances in light of Section 14(b)'s use of the term "in any State."

The District Court's analysis ignores the legal test for excluding local laws from the scope of state law. For local law to be preempted, Congress must have expressed a "clear and manifest indication . . . to supplant local authority. *Ours Garage*, 536 U.S. at 434. The phrase "in any State" expresses no "clear and manifest" congressional intent to preempt local laws. Courts that have considered similar language have found that it did not constitute "clear and manifest" congressional intent to preempt local laws.

In *Fireman's Fund*, for example, the Ninth Circuit considered whether the federal Comprehensive Environment, Response, Compensation and Liability Act ("CERCLA") preempted a city of Lodi, California, ordinance regulating hazardous waste contamination within its borders. *Fireman's Fund*, 302 F.3d at 934. A group of insurers argued that the ordinance was preempted by CERCLA because, pursuant to 42 U.S.C. § 9614(a), [20] "CERCLA explicitly authorizes states, but not municipalities, to impose additional requirements regarding the cleanup of hazardous substances." *Id.* at 941.

CERCLA contains many similarities to Section 14(b). Like Section 14(b)'s use of the phrase "in any State," CERCLA contains a "savings clause" which uses

---

[20] In its entirety CERCLA § 114(a) provides: "Nothing in this Act shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State." 42 U.S.C. § 9614(a).

the phrase "**within such State**" in its protection of "state law' from preemption.  42

U.S.C. § 9614(a) (emphasis added).[21]  Nonetheless, the Ninth Circuit rejected the

insurer's preemption argument.  The court found "*Mortier's* reasoning regarding

FIFRA is equally applicable to CERCLA."  *Fireman's Fund*, 302 F.3d at 942.

Ultimately, the Ninth Circuit held that, "[i]n the absence of a strong

indication to the contrary, we adhere to the presumption that Congress did not

intend CERCLA to 'deny local communities throughout the Nation significant

powers of self-protection.'"  *Id.* at 943 (quoting *Mortier*, 501 U.S. at 621 (Scalia,

J., concurring)).  The mere use of a phrase like "within such state' did not prevent

the Ninth Circuit from finding local laws are protected from preemption.

The same reasoning applies here.  The language that the District Court found

compelling — "in any State" — is not a "clear and manifest" expression of intent

---

[21] Other similarities exist between Section 14(b) and CERCLA.  For instance, both Acts refer only to "States" in the context of preemption but refer to "States and political subdivisions' elsewhere. *Id.* at 942. The use of the term "State" in CERCLA's "savings clause" "is not used in an express grant of acknowledgment of states' regulatory authority," but "[r]ather, it identifies the political entities whose [hazardous substances] laws withstand [CERCLA]."  (See Mem. Opin. & Ord. 7, Page ID # 1283.)   Compare CERCLA § 114 (codified at 42 U.S.C. § 9614(a)) ("Nothing in this Act shall be construed") with NLRA § 14(b) (codified at 29 U.S.C. § 164(b)) ("Nothing in this Act shall be construed").  Furthermore, the definitions section of CERCLA defines "person" to separately mean "State" and "political subdivision of a State," CERCLA § 101(21), 42 U.S.C. § 9601(21). This is much the same as the definitions section of the NLRA, which defines "employer" to separately mean "State" and a "political subdivision thereof," NLRA § 2(2), 29 U.S.C. § 152(2).

to exclude counties from the express authorization that the NLRA unquestionably grants the States to enact right-to-work laws. *See, e.g.*, *Sailors*, 387 U.S. at 108 ("number, nature and duration of the powers conferred upon [a political subdivision] and ***the territory over which they shall be exercised*** rests in the absolute discretion of the state.") (emphasis added).

### 3. Parallel language used in the Railway Labor Act confirms that the term "State" includes a state's political subdivisions.

The term "State" as used in Section 14(b) must include its political subdivisions, otherwise the term would have a different meaning than was given to it in a parallel provision of the Railway Labor Act.

The RLA, like the NLRA, contains a section addressing union-security agreements. Specifically, Section 2, Eleventh, of the RLA, like Section 8(a)(3) of the NLRA, makes closed-shop arrangements unlawful. RLA § 2, Eleventh (codified at 45 U.S.C. § 152, Eleventh). The RLA, like the NLRA, disclaims any federal intent to prohibit union-shop agreements. *Id.* Unlike the NLRA, however, the RLA expressly preempts the law "of any State" that would otherwise make union security agreements unlawful:

> Notwithstanding any other provisions of this Act, or of any other statute or law of the United States, or Territory thereof, ***or of any State***, any carrier or carriers as defined in this Act and a labor organization or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this Act shall be permitted . . . (a) to make agreements, requiring, as a

47

> condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class . . . .

*Id.* (emphasis added); *see also Beck*, 487 U.S. at 745 n.3 ("§ 2, Eleventh pre-empts state laws that would otherwise ban union shops.").

If the term "State" does not include a state's political subdivisions, as the District Court held, then this parallel provision of the RLA would preempt ***state laws*** that forbid compulsory unionism, ***but would leave political subdivisions free to pass right-to-work ordinances***.  Of course, Congress did not intend this result. When Congress preempted the law "of any State," it intended the term "State" to encompass not only laws passed by the state legislature, but also laws passed by any political subdivision of the state.

The term "State" as used in the NLRA, must similarly include a state's political subdivisions in order to give effect to the "presumption that similar language in two labor law statutes has a similar meaning. . . ." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987).  This presumption is especially strong when the two labor law statutes that contain the same or similar language are the NLRA and RLA.  *Beck*, 487 U.S. at 754.  "[O]nly the most compelling evidence" would be sufficient to persuade the Supreme Court "that Congress intended the nearly

48

identical language of these two provisions to have different meanings." *Beck*, 487 U.S. at 754.

Neither the Appellees nor the District Court cited to ***any*** evidence, let alone "the most compelling evidence," to suggest that the term "State" should be given a different meaning in the NLRA than was given to it in the RLA.

### C.    The District Court erroneously relied upon an outdated decision that is not controlling and lacks any persuasive value.

The District Court relied upon *Kentucky State AFL-CIO v. Puckett*, 391 S.W.2d 360 (Ky. 1965). This decision issued by Kentucky's, then, highest court addressed the validity of a right-to-work ordinance passed by the City of Shelbyville, Kentucky.  The *Puckett* decision concluded that the NLRA preempted the City of Shelbyville's ordinance.  The court relied entirely on federal grounds. It interpreted no Kentucky statute or case law.  Accordingly, *Puckett* was neither binding on the District Court nor is it binding on this Court.

The *Puckett* court came to an erroneous result primarily because it rendered its decision before the U.S. Supreme Court decided either *Mortier* or *Ours Garage*. Therefore, the *Puckett* Court lacked the benefit of these U.S. Supreme Court decisions holding that local laws are analyzed like state laws for preemption purposes.[22]  *Ours Garage,* 536 U.S. at 432; *Mortier,* 501 U.S. at 607-8.

---

[22] "Congress' reference to the 'regulatory authority of the State' should be read to ***preserve, not preempt***, the traditional prerogative of the States to delegate their

Moreover, the *Puckett* court's interpretation of Section 14(b) as creating a "narrow exception" to a non-existent federal preemption is contrary to *Schermerhorn*, *Algoma*, and the NLRA's legislative history. These cases, and their legislative history, plainly state that Section 14(b) was added merely to preserve the existing right to regulate compulsory unionism free from federal preemption. *See, e.g., Schermerhorn*, 373 U.S. at 750-51.

Finally, the *Puckett* court reasoned that local right-to-work laws would undermine uniformity, which it assumed Congress sought. The *Puckett* court's assumption ignores the express teaching of the U.S. Supreme Court in *Schermerhorn*:

> Congress, in other words, chose to abandon any search for uniformity in dealing with the problems of state laws barring the execution and application of agreements authorized by Section 14(b) and decided to suffer a medley of attitudes and philosophies on the subject.

*Schermerhorn*, 375 U.S. at 104-105.

Uniformity has never been a part of the right-to-work landscape. Congress has allowed wide variation in right-to-work policy at levels other than the States. Native American tribes may regulate compulsory union agreements. *See Pueblo of San Juan*, 276 F.3d 1186. Even where state law prohibits compulsory union agreements, the prohibition does not extend to federal enclaves within the State,

---

authority to their constituent parts." *Ours Garage*, 536 U.S. at 429 (emphasis added).

such as military bases or similar federally-owned property. *See Lord v. Local Union No. 2088, Int'l Brotherhood of Elec. Workers, AFL-CIO*, 646 F.2d 1057, 1062 (5th Cir. 1981). In both situations, unions and employers are faced with asymmetrical policies within each State's geographic footprint.

Even in jurisdictions where union shops are lawful, there is ***no*** guarantee that a unionized workplace will, in fact, be a "union shop." "Union shop" agreements are the product of collective bargaining. The union must propose and the employer must agree to include a "union shop" provision in the parties' union contract. Thus, "union shop" is a workplace-by-workplace issue ***even in the absence of a right-to-work law.*** *See, e.g., Erie Brush & Mfg. Corp. v. N.L.R.B.*, 700 F.3d 17, 23-24 (D.C. Cir. 2012) (noting that the employer and union failed to reach a collective bargaining agreement due to an impasse over including a "union shop" clause in the contract).

The *Puckett* interpretation of federal law was erroneous when decided, but it is far more inaccurate now. The District Court's reliance upon *Puckett* was erroneous.

## IV. "HIRING HALL" AND "DUES CHECKOFF" PROVISIONS ARE NOT PREEMPTED.

The language of Ordinance 300 includes provisions addressing two issues ancillary to its core right-to-work language. These provisions:

51

1.    Prevent deductions from wages within Hardin County for payments to the union "unless the employee has first presented, and the employer has received, a signed written authorization of such deductions, which authorization may be revoked by the employee at any time by giving written notice of such revocation to the employer." (Ordinance 300, § 5, RE 5-1, Page ID # 96.)

2.    Prevent persons in Hardin County from being denied employment because they are not "recommended, approved, referred, or cleared by or through a labor organization." (*Id.,* § 4(e), RE 5-1, Page ID # 96.)

The first issue listed above regulates what is frequently called a "Dues Checkoff" agreement between a union and an employer.  The second issue listed above regulates what is frequently called a "Hiring Hall" agreement between a union and an employer.

The District Court found these provisions are preempted by the NLRA.  In candor with this Court, the Dues Checkoff and Hiring Hall provisions of Ordinance 300 present closer preemption questions than the Ordinance's core right-to-work provisions, and are severable from them. Nevertheless, neither the Supreme Court nor the Court of Appeals for the Sixth Circuit has directly spoken to the preemption issues raised by the Dues Checkoff and Hiring Hall provisions. And, when they are examined in light of the presumption against preemption, neither is preempted by the NLRA. *Maryland v. Louisiana,* 451 U.S. 725, 746 (1981) ("Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace State law.")

### A.   Dues Checkoff Provision is not preempted.

The District Court determined that Ordinance 300's dues checkoff regulation is preempted by the NLRA because "it is not covered by § 14(b) of the NLRA." The District Court reasons that dues checkoff does not compel union membership. (Mem. Opin. & Ord., p. 14, RE 43, Page ID # 1290.)  This is simply not the case.

The payment of union dues is "*the practical equivalent* of union 'membership,' as Congress used that term in the proviso to § 8(a)(3)." *NLRB v. Gen. Motors Corp.*, 373 U.S. at 743 (emphasis added). Without an ability to revoke a dues checkoff clause that sends a portion of an employee's paycheck to the union, the employee is trapped in "*the practical equivalent* of union 'membership.'" *Id.* If employees are not free to revoke these dues checkoff provisions, if and when they no longer wish to support the union, their freedom from compulsory unionism is seriously undermined.

The District Court relied upon *SeaPak v. Indus., Technical & Prof'l Emp., Div. of Nat'l Mar. Union, AFL-CIO,* 300 F. Supp. 1197 (S.D. Ga. 1969), *aff'd sub nom.* 423 F.2d 1229 (5th Cir. 1970), *aff'd sub nom.* 400 U.S. 985 (1971).[23]

---

[23] The Supreme Court did affirm the decision of a Georgia district court finding that a dues-checkoff provision was preempted.  It did so, however, without opinion despite the fact that the district court did not analyze the same arguments made in this case, which arguably leaves room for further review.  *See SeaPak v. Indus., Technical & Prof'l Emp., Div. of Nat'l Mar. Union, AFL-CIO,* 300 F. Supp. 1197 (S.D. Ga. 1969), *aff'd sub nom.* 423 F.2d 1229 (5th Cir. 1970), *aff'd sub nom.* 400 U.S. 985 (1971). Accordingly, the grounds for the Court's finding of preemption

*SeaPAK* found a similar Dues Checkoff provision in Georgia's right-to-work law to be in conflict with Section 302(c)(4) of the LMRA.

LMRA Section 302(c)(4) provides that dues checkoff authorizations "shall not be irrevocable **for a period of more than** one year, or beyond the termination date of the applicable collective bargaining agreement, whichever occurs sooner." 29 U.S.C. § 186(c)(4) (emphasis added). Restating this legislative mandate in the affirmative, Section 302(c)(4) requires that dues deduction authorizations must be revocable *at least* once a year, or at the end of a collective bargaining agreement. In short, the LMRA provides only a maximum — and not a minimum — duration that a dues deduction authorization may remain irrevocable. Ordinance 300, Section 5 merely provides that a dues checkoff authorization must be "revo[cable] by the employee at any time." A dues checkoff clause that is revocable at any time satisfies § 302(c)(4)'s minimum requirement that such clauses not be irrevocable for a period of more than one year. It is not in conflict with it. There is no direct conflict between Ordinance 300 and Section 302(c)(4).

---

and the application of those grounds to Ordinance 300 are not known, and the district court decision did not address the novel arguments at issue in this case. For the reasons set out above, Defendants ask this Court to recognize the inherent connection between compulsory unionism and an employee's inability to revoke his or her authorization to deduct money from the employee's paycheck and send it to the union for union dues.

Similarly, there is no implied conflict. Ordinance 300 does not make compliance with Section 302(c)(4) of the LMRA impossible, or "stand as an obstacle" to achieving the objectives Congress intended by passing Section 302(c)(4). *See, Gade v. Nat'l Solid Wastes Management Ass'n*, 505 U.S. 88, 98 (2002). On the contrary, compliance with Ordinance 300's requirement ensures that dues checkoff provisions will satisfy the "shall not be irrevocable for a period of more than one year. . . ." maximizing duration created by Section 302(c)(4). Finally, *Garmon* preemption does not apply to matters covered by Section 301(c)(4). *Garmon*, 359 U.S. at 245 (*Garmon* applies only to subjects "arguably subject to § 7 or § 8 of the [NLRA]".

### B.    Hiring Hall provision is not preempted.

Ordinance 300 prohibits **mandatory** union referrals.  Section 4 makes it so workers are no longer forced to present themselves to a union and be referred through a union hall in order to obtain employment.    When Ordinance 300 is read as a whole, its overall intent is to preclude compulsory union membership.  Forcing individuals to obtain a referral from a union in order to be considered for employment is inherently coercive and debilitating to employees' freedom of choice. Therefore, a provision preserving this freedom falls within the scope of preventing compulsory unionism. *Schermerhorn*, 375 U.S. at 100-103; *Algoma*, 336 U.S. at 307.

Some courts have found that "hiring hall" agreements do not condition employment on union membership.  Legally, unions are not supposed to base their referrals upon whether an applicant is or is not a union member, or pays union dues.  *See Breininger v. Sheet Metal Workers*, 493 U.S. 69, 73-84 (1984). Accordingly, some courts have held that the NLRA preempts regulation of "hiring hall" agreements.  *Local 514, Transport Workers v. Keating*, 212 F. Supp. 2d 1319, 1327 (E.D. Okla. 2002).[24] (Section 14(b) of the NLRA does not allow State regulation because hiring halls relate to the hiring process not the "post-hiring employer-employee-union relationship").

Cases that find that the NLRA preempts regulation of "hiring hall" agreements ignore the reality of union hall referrals.  As a practical matter, required union referrals lead to pressure to join and pay union dues.  Mandatory union referrals are inherently inconsistent with truly voluntary union membership. In light of these realities, This Court should reverse the District Court conclusion that regulation of "hiring hall" agreements is preempted by the NLRA, as amended by the LMRA.

---

[24] *See, Laborers Int'l Union Local 107 v. Kunco, Inc.*, 472 F.2d 456 (8th Cir. 1973); *NLRB v. Tom Joyce Floors, Inc.,* 353 F.2d 768 (9th Cir. 1965); *NLRB v. Houston Chapter Ass'd Gen'l Contractors,* 349 F.2d 449, 451 (5th Cir. 1965), *cert. denied*, 382 U.S. 1026 (1966); *Local 514, Transport Workers v. Keating,* 212 F. Supp.2d 1319 (E.D. Okla. 2002).

56

Because the dues checkoff and hiring hall provisions of Ordinance 300 are truly ancillary to and intended to carry out Hardin County's prohibition on compulsory unionism, they are not preempted by the NLRA. *Schermerhorn,* 375 U.S. at 100-103; *Algoma*, 336 U.S. at 307.

## CONCLUSION

A careful reading of the decisions of the United State Supreme Court, as well as other authorities, demonstrate that federal labor law does ***not*** preempt Hardin County's Ordinance 300.  The NLRA nowhere preempts "right-to-work" laws.  Beyond this, Kentucky delegated to Hardin County sufficient authority to adopt its right-to-work law. Therefore, Ordinance 300 is entitled to protection as a "state law" under Section 14(b) of the NLRA.

Hardin County respectfully requests that the Court reverse the District Court's holding to the contrary.

Respectfully submitted,

/s/ John T. Lovett

John T. Lovett
Kyle D. Johnson
FROST BROWN TODD LLC
400 West Market Street, 32nd Floor
Louisville, KY  40202-3363
Telephone: (502) 589-5400
Facsimile: (502) 581-1087

*Counsel for Appellants Hardin County, Kentucky; Harry L. Berry, Judge/Executive; John Ward, Sheriff; and Jennifer B. Oldham, County Attorney*

58

## CERTIFICATE OF COMPLIANCE

Counsel for Appellants certifies in accordance with Fed. R. App. P. 32(a)(7)(C) that Appellants' Brief contains 13,848 words as calculated by the word count function of Microsoft Word.

/s/ John T. Lovett
_____
*Counsel for Appellants Hardin County, Kentucky; Harry L. Berry, Judge/Executive; John Ward, Sheriff; and Jennifer B. Oldham, County Attorney*

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of May, 2016, I electronically filed the foregoing Appellant Brief for Hardin County, Kentucky; Harry L. Berry, Judge/Executive; John Ward, Sheriff; and Jennifer B. Oldham, County Attorney with the Court using the Court's CM/ECF system which will automatically generate and send by e-mail a Notice of Docket Activity to the following: David L. Leightty: dleightty@earthlink.net; Irwin H. Cutler, Jr.: cutler@pcnmlaw.com; Robert Colone: rmcolone@teamsters89.com; Benjamin Sequoayah Basil: Basil@pcnmlaw.com; John T. Lovett: jlovett@fbtlw.com; and Kyle D. Johnson: kjohnson@fbtlaw.com.

/s/ John T. Lovett

*Counsel for Appellants Hardin County, Kentucky; Harry L. Berry, Judge/Executive; John Ward, Sheriff; and Jennifer B. Oldham, County Attorney*

# ADDENDUM

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 30(b), Defendants-Appellants, Hardin County, Kentucky; Harry L. Berry, Judge/Executive; JohnWard, Sheriff; and Jennifer b. Oldham, County Attorney, designate the following relevant District Court documents:

| Record Entry Number | Description of Document | Page ID # Range |
|---|---|---|
| 1 | Complaint and All Exhibits filed 1/14/2015 | 1-47 |
| 5 | Answer filed 2/24/15 | 74-93 |
| 5-1 | Ex. A – County of Hardin, Ordinance No. 300 | 94-98 |
| 7 | Plaintiffs' Motion for Summary Judgment, Memorandum in Support and all Exhibits filed 3/6/2015 | 100-151 |
| 8 | Supplement to Plaintiffs' Motion for Summary Judgment filed 3/9/2015 | 152-153 |
| 14 | Defendants' Response to Plaintiffs' Motion for Summary Judgment filed 4/3/2015 | 193-208 |
| 15 | Amended Complaint filed 4/3/15 | 209-219 |
| 16 | Defendants' Motion for Summary Judgment, Memorandum in Support and all Exhibits filed 4/3/15 | 220-274 |
| 31 | Plaintiffs' Joint Response/Reply to Defendants' Motion for Summary Judgment filed 4/24/2015 | 1138-1157 |
| 34 | Defendants' Reply to Plaintiffs' Response to Defendants' Motion for Summary Judgment filed 5/8/2015 | 1163-1173 |
| 42 | Memorandum of Hearing entered 8/6/2015 | 1276 |
| 43 | Memorandum Opinion & Order dated 2/3/2016 | 1277-1290 |
| 44 | Judgment entered 2/3/2016 | 1291 |
| 45 | Notice of Appeal by Defendants filed 2/29/2016 | 1292-1293 |